UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA,

v.

KHALED ABUGHANEM and
ADHAM ABUGHANEM,

Defendants.

23-CR-46 (JLS)

## DECISION AND ORDER

After a trial, the jury found Defendants Khaled Abughanem and Adham
Abughanem (collectively, "Defendants") guilty of all counts charged against each of
them in the Superseding Indictment. *See* Dkt. 316. Specifically, the jury found
Khaled and Adham guilty of:

- Count 1: Conspiracy to Kidnap Person in Foreign Country in violation
  of 18 U.S.C. §§ 956(a)(1) and 956(a)(2)(A); and

- Count 2: Kidnapping Conspiracy in violation of 18 U.S.C. § 1201(c).

The jury also found Khaled guilty of Count 3: Threatening to Retaliate Against a
Victim in violation of 18 U.S.C. § 1513(b)(2).

Before the Court are Defendants' post-trial motions. *See* Dkt. 322, 323, 324,
325.  Khaled moved for a new trial pursuant to Fed. R. Crim. P. 33 (Dkt. 322), and
for judgment of acquittal pursuant to Rule 29 (Dkt. 323).  Adham filed a separate
motion for judgment of acquittal (Dkt. 324).  He also moved to join in Khaled's

motion for a new trial (Dkt. 325).  The government opposed the motions, Dkt. 332, and Khaled replied.  Dkt. 334.

Adham's motion to join in Khaled's motion for a new trial is granted.  But for the reasons below, the Court denies each of Defendants' remaining motions.

## DISCUSSION

### I.    RULE 29 MOTIONS

#### A. Rule 29 Standard

Federal Rule of Criminal Procedure 29 directs the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  The Court must affirm a defendant's conviction "if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Cote*, 544 F.3d 88, 98 (2d Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original).  A defendant challenging his conviction under this standard "bears a very heavy burden."  *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992).

When assessing a Rule 29 motion, the Court must: (1) view the evidence in the light most favorable to the Government; (2) draw all reasonable inferences in the Government's favor; and (3) consider the evidence in its totality—not in isolation.  *See Cote*, 544 F.3d at 98.  The Government "need not negate every possible theory of innocence."  *Id.*  The Court must defer to the jury's assessment of credibility and may not "substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury."  *Id.* at 99

(internal quotation marks, citation, and alteration omitted).  In other words, "when there are competing inferences, [the Court] must defer to the jury's choice, because it is the task of the jury, not the [C]ourt, to choose among competing inferences that can be drawn from the evidence." *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) (internal quotation marks and citation omitted).

### B. Analysis

The trial evidence is sufficient to sustain convictions on all counts.

#### 1. Counts 1 and 2

Sufficient evidence supports the jury's conclusions that Khaled and Adham: (1) conspired to kidnap Shaima from Mexico to the United States, in violation of 18 U.S.C. § 956(a)(1) and 956(a)(2)(A); and (2) conspired to kidnap Shaima from the United States to Egypt and then to Yemen, in violation of 18 U.S.C. § 1201(c).

To "obtain a conviction for a conspiracy under 18 U.S.C. § 956(a)(1), the Government must prove four elements: (1) the defendant agreed with at least one person to commit [kidnapping]; (2) the defendant willfully joined the agreement with the intent to further its purpose; (3) during the existence of the conspiracy, one of the conspirators committed at least one overt act in furtherance of the object of the conspiracy; and (4) at least one of the conspirators was within the jurisdiction of the United States when the agreement was made." *United States v. Diaz*, 90 F.4th 335, 342 (5th Cir. 2024) (internal citation and quotation marks omitted).

Similarly, to obtain a conviction under 18 U.S.C. § 1201(c), the government must "prove that [1] [the defendant] agreed with another to commit the offense; [2]

3

that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy; and [3] that an overt act in furtherance of the conspiracy was committed." *United States v. Krivoi*, 80 F.4th 142, 156 (2d Cir. 2023) (internal citation and quotation marks omitted).[1]

Here, the admitted evidence supports each of these elements, namely, that Khaled and Adham tricked Shaima into traveling from Mexico to Lackawanna, New York, and that Shaima remained in the Abughanem family residence until Defendants tricked her into traveling to Egypt and onto Yemen—where she remained against her will for over a year.

For example, Shaima testified at length as to her beliefs about Defendants' intentions, as well as her own experiences. Contemporaneous documentary, video, and testimonial evidence corroborated Shaima's testimony. In addition, multiple witnesses testified regarding Defendants' statements and actions while in Mexico demonstrating—for example—that they apparently supported of Shaima's marriage to her Mexican fiancé. The government also introduced extensive corroborative text messages among Defendants detailing their plans regarding Shaima.

---

[1] Kidnapping may be committed by seizing, confining, inveigling, decoying, kidnapping, or otherwise abducting the victim. *See* 18 U.S.C. § 1201(a)(2). *See also* 18 U.S.C. § 956(a)(1) (criminalizing "an act that would constitute the offense of . . . kidnapping . . . if committed in the special maritime and territorial jurisdiction of the United States . . . if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy"). Thus, a kidnapping can be accomplished by "nonphysical takings by which the kidnapper, through deception or some other means, lures the victim into accompanying him." *United States v. Macklin*, 671 F.2d 60, 66 (2d Cir. 1982).

4

Khaled and Adham argue that there is no evidence that they entered into any unlawful agreement to kidnap Shaima. Specifically, Khaled argues that there was no "testimony to prove that the trip to Egypt was based on some agreement with or among Khaled . . . and Adham to trick Shaima into travel[]ing to Egypt." Dkt. 323-1 at 5.[2] Adham argues that the "Government failed to establish that [he] agreed that [Shaima] should be inveigled to travel from Mexico to the United States . . . or that he was aware that any participant in the conspiracy would be willing to use psychological or physical force to cause her to travel back to the United States." Dkt. 324 at 2. Adham further argues that "the Government failed to establish that [he] agreed to inveigle [Shaima] to travel to the Middle East for the same goal or that he knew that she would not be allowed to marry the fiancé[] of her choice." *Id.* Instead, according to Adham, "the Government proved merely that [he] was present during certain events in the conspiracy and that he was merely aware of the intentions of co-conspirator [Khaled]." *Id.*

The trial evidence, however, supports the jury's conclusion that Khaled and Adham agreed to kidnap Shaima from Mexico to the United States, and then from the United States to Yemen. For example, the government introduced text messages and other electronic communications among Defendants (and others) showing that they repeatedly discussed their disapproval of Shaima's travel to Mexico—and further discussed their plan to trick her into traveling from Mexico to

---

[2] Page numbers refer to the CM/ECF generated numbering in the header of each page.

the United States, hold her within the family residence in Lackawanna, trick her into traveling to Egypt and onto Yemen and, ultimately, force her to remain in Yemen. The messages detail—for example—Defendants' plans to monitor Shaima after she returned to Lackawanna by taking steps such as installing cameras. They also contain discussions about fooling Shaima into thinking that she would marry her Mexican fiancé in the Middle East. The messages further demonstrate that, while Adham (and others) took steps to carry out these plans, they did so—at least in part—at the direction of Khaled.

The jury, therefore, could reasonably conclude that Defendants entered the unlawful agreements as charged. Indeed, when "a defendant challenges the sufficiency of the evidence in a conspiracy case, 'deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (quoting *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004)).

Khaled further argues that there "was no proof of ransom or reward or any 'other' benefit to Khaled." Dkt. 323-1 at 6.[3] He explains that, "[s]imply framing the

---

[3] Count 1 of the Superseding Indictment charges that the object of the conspiracy was to "seize, confine, inveigle, decoy, kidnap, abduct, and carry away, and hold for ransom, reward, and otherwise" Shaima. Similarly, Count 2 charges that Defendants conspired to "unlawfully and willfully seize, confine, inveigle, decoy, kidnap, abduct, and carry away, and hold for ransom, reward, and otherwise" Shaima. *See* 18 U.S.C. §§ 956(a)(1); 1201(a)(2); 1201(c).

charge in terms of a general wish by Khaled to 'control' or influence his daughter's marriage plans is not sufficient to establish an agreement to kidnap, by inveigling or otherwise." *Id.*

But the government did, in fact, offer evidence showing that Khaled and Adham agreed to hold Shaima "for ransom, reward or otherwise." *See* 18 U.S.C. § 1201(a). The word "otherwise" was added to § 1201(a) "to make clear that a nonpecuniary motive did not preclude prosecution under the statute." *United States v. Healy*, 376 U.S. 75, 81 (1964). Thus, a victim need only be kidnapped "in order that the captor might secure some benefit to himself." *Gooch v. United States*, 297 U.S. 124, 128 (1936). *See also* Sand's Modern Federal Jury Instructions, Inst. 42-4, cmt. (listing examples of non-pecuniary reasons for kidnapping). Here, there is evidence to support that Shaima was held for multiple reasons. For example, Defendants' text messages reveal discussions of their plans to keep Shaima in Yemen for several reasons—including to marry her to an individual of her family's choosing, and/or to punish her.

Lastly, the additional arguments that Adham makes as to Counts 1 and 2 are unavailing. Adham argues that "the Government never proved that [he] was aware that representations made by his parents to convince [Shaima] to return [to the United States from Mexico] were lies." Dkt. 324 at 5. But the trial evidence—such as the text messages among Defendants and others—would allow the jury to infer that Adham was aware of the plans for Shaima. Adham further argues that there is no "proof that any member of the conspiracy intended to use force if [Shaima] did

not agree to travel back to the United States willingly." *Id.* at 6. The government, however, offered evidence to prove that Adham knew that at least one member of the conspiracy was willing to use physical force against Shaima if their plans failed. Specifically, the messages among Defendants and others made repeated reference to violence against Shaima. Moreover, "coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan." *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990).

In sum, sufficient evidence supports the convictions on Counts 1 and 2. The motions are denied as to these counts.

### 2. Count 3

Sufficient evidence also supports the jury's verdict as to Count 3 against Khaled. The statute provides, in relevant part, that whoever "threatens" to engage in conduct causing "bodily injury to another person . . . with intent to retaliate against any person for . . . any information relating to the commission or possible commission of a Federal offense . . . given by a person to a law enforcement officer" shall be subject to criminal penalties. *See* 18 U.S.C. § 1513(b)(2).

Here, the government introduced evidence of a recorded jail call among Khaled, his wife, and their daughter that took place in March 2023—while Khaled was in pretrial custody and Shaima was in Yemen. During the call, Khaled directed that "the one over there" be "slaughtered." The government also introduced evidence that, prior to Khaled's arrest, Shaima had told Khaled that the FBI was investigating her case. As such, a reasonable jury could conclude that, during that

call, Khaled threatened to harm Shaima in retaliation for providing information about her kidnapping to federal law enforcement.

Khaled argues that: (1) there is insufficient evidence that he acted with retaliatory intent; and (2) there is no evidence that he intended the threat to be conveyed to Shaima. *See* Dkt. 323-1 at 8-10. Specifically, he purports that the "there was no evidence of any attempt to communicate the contents of [the jail] call to Shaima . . . as a threat or attempted threat, with no proof of any intent to retaliate against Shaima." *Id.* at 9. He explains that, even assuming that "the reference in Count 3 to the 'one over' there could be inferred to mean Shaima, without communication to Shaima or a request to his spouse to communicate to Shaima, there can be no threat, attempted threat, or intent to retaliate." *Id.*

Khaled's statements during the call, however, permit a reasonable inference of retaliatory intent. Indeed, the jury "readily and reasonably could have inferred . . . that [Khaled] had reason to be displeased with [Shaima's] cooperation with the government. . . ." *United States v. Rucker*, 766 F.3d 638, 645 (7th Cir. 2014) (finding sufficient evidence of retaliatory intent under 18 U.S.C. § 1513(b)). And the jury also could have inferred that Khaled's statements during the call indicate that he was blaming Shaima for his arrest and detention. To the extent Khaled disagrees with such inferences, that does not change the outcome here. Indeed, "Rule 29 does not allow the Court to interfere with the way in which the jury resolved competing inferences that could be drawn from the evidence." *United States v. Zodhiates*, 235 F. Supp. 3d 439, 447-48 (W.D.N.Y. 2017).

9

Finally, even if Khaled's statements were not conveyed to Shaima, that also does not alter the outcome of this motion. Under the statute, Khaled need not have caused injury to Shaima; nor did he need to intend to carry out the threat. *See* 18 U.S.C. § 1513(b)(2). Rather, "it is sufficient if [he] knowingly threatened to cause bodily injury." *See* Sand's Modern Federal Jury Instructions, Instruction 46-76. *See also United States v. Kelner*, 534 F.2d 1020, 1023 (2d Cir. 1976) (affirming conviction for making interstate threat and rejecting as "improbab[le]" the argument that "there was no specific person to whom the threat was addressed and to whom the defendant intended to cause emotional suffering").

In sum, sufficient evidence supports the jury's conclusion that Khaled threatened to retaliate against Shaima for information Shaima gave to law enforcement relating to the commission and possible commission of a Federal offense. The Court denies Khaled's motion as to Count 3 as well.

## II.    RULE 33 MOTIONS

### A. Rule 33 Standard

Federal Rule of Criminal Procedure 33 allows the Court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33 "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). That discretion includes the ability to weigh the evidence and evaluate the credibility of witnesses. *Id.* But only in "exceptional circumstances" may a trial judge "intrude upon the jury function of

credibility assessment"—for example, where "testimony is patently incredible or defies physical realities." *Id.* at 1414.

Indeed, "a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) (internal quotation marks and citation omitted). This standard precludes the Court from "reweigh[ing] the evidence and set[ting] aside the verdict simply because it feels some other result would be more reasonable." *Id.* (internal quotation marks and citation omitted). This standard also requires the Court to "consider any reliable trial evidence as a whole, rather than on a piecemeal basis." *Id.* at 189.

## B. Analysis

Defendants argue that a new trial is warranted for several reasons. Their motion largely recasts their Rule 29 arguments as arguments for a new trial, relying on the "unique circumstances" of this case. *See* Dkt. 322-1 at 3-4. They also argue that the trial was clouded by other supposed defects—including juror bias, a *Giglio* violation, an allegedly defamatory postcard, various aspects of Shaima's testimony and the government's summation, as well as problematic translations. *See id.* at 3-7. Because the interest of justice does not require a new trial on this record, the Court denies Defendants' Rule 33 motion.

### 1. Shaima's Testimony

Any supposed false or conflicting testimony from Shaima does not justify a new trial.

According to Defendants, Shaima could not have been tricked into traveling from Mexico to the United States because "she admitted that the duration of her trip to Mexico, at the [outset], was expected to last a few weeks." Dkt. 322-1 at 3. They also point out that Shaima "reluctantly acknowledged a conversation with her mother wherein Shaima rejected the idea that she should stay in Lackawanna with her two youngest siblings, while her parents travel[]ed to Egypt for the weddings of [Shaima's brothers]." *Id.* at 3-4. Defendants further claim that Shaima "falsely testified that she was not aware of her brother Adham's planned marriage, despite a September 17, 2021 email Shaima sent to [her fiancé] . . . which revealed that most of the Abughanem family was headed to the Middle East for her brothers' weddings." *Id.* at 5. And they purport that "Shaima also admitted that she lied when she told her mother that she was not at all involved in the arrest of Khaled and Adham on February 14, 2023 . . . though Shaima well knew that her evolved narrative, adding alleged threats and violent acts, never raised before, prompted the federal charges." *Id.* Defendants also identify several aspects of Shaima's testimony relating to her education at the University at Buffalo that they believe impair her credibility. *See id.* at 5-6.

Even if Defendants believe that Shaima's testimony was not credible and was inconsistent with other evidence, that does not justify a new trial. Indeed, nothing

Case 1:23-cr-00046-JLS    Document 337    Filed 02/26/25    Page 13 of 20


about her testimony was so "patently incredible" as to "compromise[] the reliability of the verdict." *United States v. Landesman*, 17 F.4th 298, 331 (2d Cir. 2021). Considering Shaima's testimony as a whole—much of which was corroborated by testimony of other witnesses, as well as contemporaneous writings, photographs, video, and Khaled's recorded conversations with her—there is no "real concern that an innocent person may have been convicted." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). The Court, therefore, "'defer[s] to the jury's resolution of conflicting evidence.'" *Archer*, 977 F.3d at 188 (quoting *McCourty*, 562 F.3d at 475–76).

### 2. Alleged Inflammatory Statements

Defendants also seek a new trial based on alleged "inflammatory testimony from Shaima regarding proclamations of standard Houthi slogans," such as "Death to America! Death to Israel!" Dkt. 322-1 at 5. According to Defendants, this "inflammatory testimony" was "exacerbated by the government's closing argument, where it used slides showing disputed translations of phone discussions between Shaima and Khaled in January 2023 that highlighted alleged anti-American statements attributed to Khaled." *Id.* Neither of these warrants a new trial.

#### a. *Shaima's Testimony Regarding Houthi Slogans*

As a preliminary matter, Defendants waived any objection to Shaima's testimony concerning slogans she heard in Sana'a. Waiver "can result only from a defendant's intentional decision not to assert a right." *United States v. Spruill*, 808 F.3d 585, 597 (2d Cir. 2015). Here, defense counsel confirmed at trial that they

made a strategic choice not to object to this aspect of Shaima's testimony. As such, Defendants may not obtain a new trial on that basis. *See United States v. Graham*, 51 F.4th 67, 80 (2d Cir. 2022) ("Waiver, the intentional relinquishment or abandonment of a known right . . . extinguishes an error along with any appellate review") (internal citation, quotation marks and alterations omitted).

In addition, the Court, *sua sponte*, provided the jury with a cautionary instruction about how it may consider Shaima's testimony regarding what she heard in Sana'a. Where "an inadmissible statement is followed by a curative instruction, the court must assume 'that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions . . . and a strong likelihood that the effect of the evidence would be devastating to the defendant.'" *United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008) (quoting *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)). There is no reason to believe that the jury was unable to follow this cautionary instruction.

Lastly, Shaima's testimony was relevant to the element of a kidnapping requiring the government to prove that the victim be "h[eld] for ransom[,] reward or otherwise." *See* 18 U.S.C. § 1201(a). Shaima testified that, although she was born in Yemen, the atmosphere of the country was decidedly different when she returned several years later. Her testimony regarding the slogans, therefore, was relevant to her understanding of her ability to freely move or seek help while in Sana'a.

14

b. *Statements During Government's Summation*

To "obtain a new trial based on a prosecutor's purportedly improper statement made in summation, a defendant bears the heavy burden of demonstrating that the alleged misconduct is so severe and significant as to result in the denial of the defendant's right to a fair trial." *Zodhiates*, 235 F. Supp. 3d at 456 (internal citation, quotation marks, and alterations omitted). During a "jury summation, the 'government has broad latitude in the inferences it may reasonably suggest to the jury.'" *United States v. Abdallah*, 840 F. Supp. 2d 584, 623 (E.D.N.Y. 2012), aff'd, 528 F. App'x 79 (2d Cir. 2013) (quoting *United States v. Williams*, 205 F.3d 23, 35 (2d Cir. 2000)). And the Court will not "lightly overturn a conviction solely on the basis of a prosecutor's misstatement in summation." *United States v. Nersesian*, 824 F.2d 1294, 1327 (2d Cir. 1987) (internal citation and quotation marks omitted).

Here, the government's use of an exhibit during its summation depicting what could be interpreted as anti-American statements by Khaled did not "result in the denial of the defendant's right to a fair trial." *Zodhiates*, 235 F. Supp. 3d at 456 (internal citation, quotation marks, and alterations omitted). The government displayed the exhibit to rebut defense counsel's claim in his closing argument that Khaled was "proud American." And the government did not belabor the point—nor did it connect the exhibit to Shaima's testimony about hearing "Death to America." A new trial is not warranted in these circumstances.

3. <u>Alleged Juror Bias</u>

Defendants also argue that a new trial is necessary "based on unrevealed potential bias of the jury foreperson," Dkt. 322-1 at 10, because the foreperson "failed to divulge that he was deployed to Iraq by the United States Army." *Id.* at 4. According to Defendants, the "jury did not deliberate extensively . . . and could not have worked through, with any detail, the extensive jury charge and trial exhibits." *Id.* at 10. They urge that, considering the "fairly quick return with a guilty verdict," the "foreperson's role cannot be minimized." *Id.*

To "obtain a new trial" based on "juror nondisclosure," a defendant "must show *both* that a juror gave a dishonest answer, *and* that the correct answer would have provided a basis for the defendant to challenge the juror for cause." *United States v. Shaoul*, 41 F.3d 811, 816 (2d Cir. 1994) (emphasis in original). Defendants show neither.

First, there is no evidence of a dishonest answer. When asked about employment history, the juror disclosed that he served in the military. But the Court did not ask where, if anywhere, he had deployed. Nor did the lawyers request that the Court ask such a question. And although the Court asked the prospective jurors a series of questions pertaining to familiarity with the Middle East, it did *not* ask whether anyone had *traveled* to the Middle East. As such, there is nothing to suggest that this juror's failure to disclose his deployment to Iraq amounted to a dishonest answer.

16

Second, even if the juror had disclosed his deployment to Iraq, that alone would not have warranted a strike for cause. Challenges "for cause are generally based on actual bias, implied bias, or inferable bias." *United States v. Greer*, 285 F.3d 158, 171 (2d Cir. 2002)

Here, the fact that the juror had deployed to Iraq does not give rise to any such bias. Indeed, Defendants might have used a peremptory challenge had they known this information. But it "ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555 (1984). And because defense counsel allegedly discovered the information "in a 'Linked In' post," *see* Dkt. 322-1 at 10, he could have considered it when exercising peremptory challenges. Counsel had access to the venire list many days prior to jury selection. The fact that he only actually discovered such information "post-trial" does not justify "recreat[ing] the peremptory challenge process" now. *See McDonough Power Equip.*, 464 U.S. at 555.

### 4. Alleged *Giglio* Violation

Defendants further argue that "the verdict is clouded by a *Giglio* violation involving law enforcement officer and case agent Edmund Susman, who filed a federal lawsuit shortly after the verdict, reported on the front page of the Buffalo News, disclosing that he checked himself in for psychiatric evaluation in 2015, based on suicidal ideations. . . ." Dkt. 322-1 at 4. They claim that this information

17

was "never disclosed to defense counsel" and, given Susman's "adoption of Shaima Abughanem's narrative, revised after July 2022," a new trial is warranted. *Id.*

Defendants' motion for a new trial on this basis is denied as well. The government disclosed this information to the Court *ex parte* prior to trial. *See* Dkt. 286. And after reviewing this information, the Court agreed that it was not material impeachment information and, therefore, need not be disclosed pursuant to *Giglio*. *See id.* That remains the case.

### 5. Postcard

Defendants also seek a new trial based on a postcard addressed to Khaled and allegedly received at the Abughanem family residence prior to the jury's verdict. *See* Dkt. 322-1 at 5. Defendants provide a copy of the postcard, which is postmarked December 19, 2024. *See* Dkt. 322-6. It refers to Khaled as a "loser" and a "tool"—and it instructs that he "enjoy prison." *Id.*

Without more, there is no basis to conclude that the postcard "compromised the reliability of the verdict." *Landesman*, 17 F.4th at 331 (internal citation omitted). Indeed, there is no evidence that any trial participant was even aware of the postcard during the trial. Absent any indication that the postcard had any impact on the trial, Defendants' motion on this basis is denied.

### 6. Translations

Defendants next argue that a new trial is warranted based on the testimony of the "uncertified Arabic translator called by the government." Dkt. 322-1 at 6. According to Defendants, the translator "admitted that he chose to add 'context' to

certain words which could mean different things, [and] in each instance, choosing a meaning more detrimental to Khaled . . . ." *Id.* They also state that translator added "an inflammatory flourish (a gesture indicating a motion across his neck) to his translation of a jail call between Khaled and his wife, Amina." *Id.*

Considering the totality of the evidence, however, the jury could have reasonably concluded that the translations were accurate. The government introduced evidence, for example, that the translator was experienced, reviewed the original source material, and had no substantive knowledge of the case. Defense counsel could have—and did—cross examine the translator on these topics. As such, Defendants identify no "exceptional circumstances" relating to translations that would permit the Court to "intrude upon the jury function of credibility assessment." *Landesman*, 17 F.4th at 330 (internation citation and quotation marks omitted).

### 7. Sufficiency of the Evidence

Lastly, Defendants raise additional arguments regarding the sufficiency of the evidence for all three counts.

As to Counts 1 and 2, Defendants argue that there "was no testimony or evidence presented to prove that Khaled agreed with Shaima's idea to inveigle or trick her to go to Egypt." Dkt. 322-1 at 4. Nor "was there any testimony," they claim, "to prove that the trip to Egypt was based on some agreement with or among Khaled . . . and Adham to trick Shaima into travel[]ing to Egypt." *Id.* To the extent that Defendants claim that insufficient evidence supports the elements of the

conspiracy counts, their motion is denied for the reasons discussed above with respect to their Rule 29 motions.

As to Count 3, Khaled reasserts many of the same arguments from his Rule 29 motion, including that there is insufficient evidence that he acted with retaliatory intent, or intended the threat to be conveyed to Shaima. He sets forth no valid basis for a new trial under Rule 33.

In sum, because the interest of justice does not require a new trial—on account of any or all of these points collectively—the Court denies Defendants' Rule 33 motions.

## CONCLUSION

For the reasons above, the Court (1) grants Adham's motion to join in Khaled's motion for a new trial (Dkt. 325); (2) denies Defendants' motion for a new trial (Dkt. 322); (3) denies Khaled's motion for judgment of acquittal (Dkt. 323), and (4) denies Adham's motion for judgment of acquittal (Dkt. 324).


SO ORDERED.

Dated:      February 26, 2025
            Buffalo, New York

                                        _____
                                        JOHN L. SINATRA, JR.
                                        UNITED STATES DISTRICT JUDGE